IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| Yun Gu and Guang Yang,<br><br>Plaintiffs,<br>v.<br><br>Ur Jaddou, Director, United States Citizenship and Immigration Services,<br><br>Defendant. | C/A No.: 1:23-cv-11362 |

**COMPLAINT**

Congress requires the Defendant ("USCIS") to adjudicate a Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status in 180 days. 8 U.S.C. § 1186b(c)(3). USCIS concedes it is required to decide Forms I-829 within 180 days,[1] but reports that it takes 57 months to decide 80% of all Forms I-829. Because statutory deadlines are enforceable, even where the Defendant does not "believe it is obliged to make a determination within" the statutory deadline, *Galvez v. Cuccinelli*, No. C19-0321RSL, 2020 U.S. Dist. LEXIS 184469, at *25 (W.D. Wash. Oct. 5, 2020), this Court should compel action on Plaintiff's petition which has been pending for 33 months.

**PARTIES**

1. Plaintiff Yun Gu is a citizen and national of the People's Republic of China who currently lives in Brookline, MA.

[1] "DHS acknowledges that processing times for many forms, including Form I–829, have exceeded the goals established by USCIS. Furthermore, DHS acknowledges its obligation to adjudicate Form I–829 filings within 90 days of the filing date or interview, whichever is later." Final Rule, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46788, 46854 (Aug. 3, 2020).

2. Plaintiff Guang Yang is a citizen and national of the People's Republic of China who currently lives in Brookline, MA.

3. Defendant Ur Jaddou is the Director of the United States Citizenship and Immigration Services. In her official capacity, she oversees the adjudication of all immigration benefit petitions and adjudications under the *Immigration and Nationality Act*, including those under 8 U.S.C. §§ 1153(b)(5), 1186b.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331. *Califano v. Sanders*, 430 U.S. 99, 106 (1977).

5. Under its federal question jurisdiction, this Court can hear claims under the *Administrative Procedure Act* (5 U.S.C. § 501, *et seq.*) ("APA").

6. Under the APA, this Court can compel agency action that is unreasonably delayed or unlawfully withheld. 5 U.S.C. §§ 555(b), 706.

7. Under its federal question jurisdiction, this Court can also provide declaratory relief under 28 U.S.C. § 2201.

8. Venue is proper in this Court and this Division under 28 U.S.C. § 1391(E) because Plaintiffs live in this District and Division.

9. No statute or regulation requires an administrative appeal of the delays Plaintiffs challenge in this case. Thus, Plaintiffs have exhausted all administrative remedies or constructively exhausted all administrative remedies. *Darby v. Cisneros*, 509 U.S. 137 (1993).

## LEGAL BACKGROUND

### *EB-5 Visa Program*

10. Congress created the EB-5 visa as part of the *Immigration Act of 1990*. The statute provides:

> Visas shall be made available… to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise … in which such alien has invested … capital … and which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

8 U.S.C. § 1153(b)(5).

11. EB-5 investors accordingly make an equity investment into an EB-5 "new commercial enterprise" ("NCE") which uses their capital to create American jobs in a dedicated EB-5 project.

12. At all times relevant to this case, the minimum EB-5 capital investment was USD $1 million. This minimum amount was reduced to $500,000 where immigrant investors select qualifying EB-5 projects with principal places of business in a "Targeted Employment Area," specifically a geographic location in "a rural area or an area which has experienced high unemployment (of at least 150 percent of the national average rate)." 8 U.S.C. § 1153(b)(5)(B)(iii); *see also* 8 C.F.R. § 204.6(j)(6).

13. It is very common for multiple investors to aggregate their capital and utilize the same NCE to obtain lawful permanent residency. *See* 8 CFR § 204.6(g). Provided that the NCE can show it is more likely than not that it will create 10 jobs per investor, every EB-5 investor in the NCE is eligible for immigrant petition approval and, permanent residency.

14. Pursuant to the governing statute and regulations, EB-5 investors can structure their investments one of two ways, diverging mostly over the measurement of job creation. A "Direct" EB-5 requires the creation of jobs through direct NCE hires—essentially W-2 employees working 35 hours a week or more. This is a permanent part of the Immigration and Nationality Act.

15. However, in 1992, as part of section 610 of the *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act*, Congress created the "Immigrant Investor Pilot Program" designed to encourage immigrant investment in a range of business and economic development opportunities within designated entities called "Regional Centers." In 2012, Congress removed the word "Pilot" from the program. *See* Policy Memo, USCIS, PM-602-0083, EB-5 Adjudications Policy, (May 30, 2013) (hereinafter "Regional Center Program"). The Regional Center Program is subject to continued renewal by Congress.

16. The quintessential difference between a "Direct" EB-5 petition and a "Regional Center" EB-5 petition is that the latter allows for job creation indirectly —a Regional Center NCE may show job creation through economic modeling based on, for example, the impacts of construction spending. *See* 8 C.F.R. § 204.6(m)(7)(ii). An NCE associated with a Regional Center need not make any direct W-2 hires.

17. Petitions related to investments in Regional Centers accommodate larger numbers of investors in the same NCE because of job creation scaling. A given project might, for example, create hundreds or thousands of jobs, calculated through "reasonable methodologies" as contemplated by 8 C.F.R. 204.6(m)(7)(ii), evidenced through a job creation report authored by an economist using accepted econometric models such as RIMS II or REDYN.

18. Petitions associated with a Regional Center have dominated USCIS's modern inventory of EB-5 filings, accounting for many visas issued in any given year. *See, e.g.,* Preference Visas Issued for FY 2018 (available at https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2018AnnualReport/FY18AnnualReport%20-%20TableVI-PartIV.pdf (last visited Jun 14, 2022).

19. To facilitate the ease and consistency for large numbers of investors in each NCE, a Regional Center will provide templated materials for the use of their investor's filing of his or her associated EB-5 petition. In other words, information and documentation relating to the NCE's formation, its business plan, its ongoing operations, and job creation are the same for every investor in a Regional Center NCE, while the biographic information and unique investment information will differ for each investor.

20. Given that hundreds, potentially thousands, of pages in each EB-5 investor's petition filings will match those of her fellow NCE owners, for more than a decade USCIS has enacted policies to streamline adjudications and accord deference to materially similar filings.[2]

*EB-5 Immigration Process*

21. The EB-5 immigration process begins when the investor files a Form I-526, Immigrant Petition by Alien Investor.

22. Once USCIS approves an investor's Form I-526, the investor can seek to adjust status to that of a conditional lawful permanent resident or process an immigrant visa at a consulate abroad. 8 U.S.C. § 1186b(a)(1).

23. Upon successfully adjusting status or processing abroad, an EB-5 investor is granted conditional permanent residency ("CPR"), which expires exactly two years thereafter.

---

[2] *See, e.g.,* "Adjudication of EB-5 Regional Center Proposals and Affiliated Form I-526 and Form I-829 Petitions; Adjudicators Field Manual (AFM) Update to Chapters 22.4 and 25.2 (AD09-38)" available at https://www.uscis.gov/sites/default/files/document/memos/Adjudicating_of_EB-5_121109.pdf ("USCIS wishes to streamline the Regional Center Proposal and EB-5 petitioning processes. Distinct EB-5 eligibility requirements must be met at each stage of the EB-5 immigration process. If USCIS evaluates and approves certain aspects of an EB-5 investment, that favorable determination should generally be given deference at a subsequent stage in the EB-5 process").

24. During "the 90-day period before the second anniversary of the" investor's CPR, the investor must file an I-829, Petition by Investor to Remove Conditions on Permanent Resident Status. 8 U.S.C. § 1186b(d)(2); 8 C.F.R. § 216.6(A)(1)(i).

25. During this process, the investor must demonstrate again that he or she "invested, or is actively in the process of investing, the requisite capital;" "sustained" the investment throughout the period of conditional residency; and "otherwise" conforms to the requirements of the EB-5 program. 8 U.S.C. § 1186b(d)(1).

26. The investor "will be considered to have sustained the actions required for removal of conditions if he or she has, in good faith, substantially met the capital investment requirement of the statute and continuously maintained his or her capital investment over the two years of conditional residence." 8 C.F.R. § 216.6(a)(4)(iii). Further, USCIS requires "[e]vidence that the alien created or can be expected to create within a reasonable time ten full-time jobs for qualifying employees." 8 C.F.R. § 216.6(a)(4)(iv).

27. Congress mandated the Form I-829 phase of this EB-5 immigration process to take a maximum of 180 days. "[T]he Attorney General *shall* make a determination, within 90 days of the date of such filing or interview (whichever is later), as to whether the facts and information described in subsection (d)(1) of this section and alleged in the petition are true with respect to the qualifying commercial enterprise." 8 U.S.C. § 1186b(c)(3)(A) (emphasis added).

28. And the "decision on the petition shall be made within 90 days of the date of filing or within 90 days of the interview, whichever is later." 8 C.F.R. § 216.6(c)(1).

29. If the Agency approves the Form I-829 petition, the Agency will remove the conditional basis of the investor's lawful permanent residency as of the date on which the investor originally acquired the conditional lawful permanent residency. 8 C.F.R. § 216.6(d)(1).

30. However, if the Agency denies the Form I-829 petition, it is required to terminate the investor's conditional lawful permanent residency status and initiate removal proceedings. During those proceedings, the investor may seek review of the denial. 8 C.F.R. § 216.6(d)(2).

31. Currently, it takes the Agency 8.15 hours to adjudicate a Form I-829 petition. *See* Proposed Rule, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62280, 62326 (Nov. 14, 2019).

32. Presently, each investor pays a filing fee of $3,750, plus an $85 biometrics fee for each family member that is included in the Form I-829 filing.

33. USCIS routinely waives the Form I-829 interview requirement.

*USCIS Adjudication Process*

34. USCIS maintains a dedicated Immigrant Investor Program Office ("IPO") to handle all EB-5 related filings.

35. The IPO does not receive funds appropriated by Congress. Rather, it is authorized by statute to charge fees to cover the cost adjudicating EB-5 petitions in a reasonable amount of time.

36. EB-5 volume has decreased from its high point in Fiscal Year 2017 when a total of 24,992 Form I-526 petitions were pending before the IPO. As of the end of June 2019, only 13,070 petitions were pending. See USCIS, "Number of Form I-526, Immigrant Petition by Alien Entrepreneur, by Fiscal Year, Quarter, and Case Status 2008-2019."[3]

[3] available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Employment-based/I526_performancedata_fy2019_qtr3.pdf (last visited Jun. 29, 2022).

37. By Fiscal Year 2019, the IPO's productivity decreased significantly. For instance, in the Third Quarter of FY2019, only 579 Form I-526 petitions were adjudicated. This is significantly less than the first quarter of the fiscal year, when 2,573 were adjudicated.

38. Indeed, USCIS sent shockwaves through the EB-5 stakeholder community when it exploded the public processing times for investor filings overnight. In April 2019, the published processing times for Form I-526 were pegged at 20.5 to 27 months. Then, as of May 2019, the processing times were published to be *29 to 45.5 months*.

39. Two years later, USCIS reported that it took between 37 and 248 months.

40. This means in a matter of months, the "processing times" dropped from 20 to 5 years with no discernable increase in productivity.

41. As of this filing, the Agency reports that it decides 80% of Forms I-829 in 57 months.

42. USCIS processing times are not accurate. In fact, USCIS does not keep performance metrics for any EB-5 Forms; rather, its EB-5 processing times are based on assumed metrics.

43. USCIS also does not maintain performance statistics for the IPO. Despite its mandate to record man hours per petition decided, the IPO does not monthly report actual man hours per petition to the Office of Performance and Quality or the National Benefits Center.

44. Rather, once a year, the IPO coordinates with the Office of Performance and Quality to collect and present a combination of raw data pulled from CLAIMS3 and WebTA with methodological adjustments based on various assumptions to derive assumed (but not actual) adjudication metrics.

45. The assumptions that USCIS uses to apply methodological adjustments and USCIS's presentation of the assumed metrics vary over time.

46. Because USCIS does not record or report IPO adjudicator's actual hours worked on any EB-5 petition, it does not actually know how long it takes to adjudicate a particular Form I-829.

47. There is no discernable increase in the efficiency of Form I-829 adjudications notwithstanding Director Kendall's assertions that Form I-526 adjudicators were "pivoted" to Form I-829 work. The Agency's so-called "normal" processing times for Form I-829 grew to *nearly 21 years*.

48. Indeed, USCIS frequently manipulates its processing times and publishes information to the public which is not accurate. As stated above, the Agency will not entertain investors' Form I-829 delay inquiries unless a Form I-829 was filed on or before August 20, 2000.

49. To put this timeframe into context, USCIS was created by Congress as part of the *Homeland Security Act of 2002* and came into existence on March 1, 2003. Yet, the Agency is informing the public that it is "normal" for a Form I-829 to be pending longer than its entire existence. Indeed, the Agency will not entertain a delay inquiry relating to an I-829 unless it was filed during the Clinton Administration.

50. USCIS has taken affirmative steps to delay adjudication of Form I-829 petitions. This includes, but is not limited to, the assignment of IPO staff to non-IPO matters.

51. This policy has led to unreasonable delays and harmed EB-5 immigrant petitioners and their families across the board, including Plaintiffs.

52. The Form I-829 regulations provide that upon filing, EB-5 immigrants' permanent resident status "shall be extended automatically, if necessary, until such time as USCIS has adjudicated the petition." 8 C.F.R. 216.6(a)(1)(i).

53. Despite the statutory and regulatory deadlines, USCIS has normalized *ultra vires* delays in the adjudication of Form I-829s. Specifically, the Agency issues receipt notices evidencing

extension of status for 18 and 24 months. See "Update to Form I-797 Receipt Notices for Form I-751 and Form I-829" available at https://www.uscis.gov/news/alerts/update-to-form-i-797-receipt-notices-for-form-i-751-and-form-i-829 (last visited Jun. 29, 2022).

54. However, even these extensions are not long enough, and EB-5 immigrants are often left without evidence of their status, precluding them from employment and travel opportunities.

55. Immigrants often request ongoing proof of status through obtaining stamps in their passports. These stamps are known as ADIT stamps. These must be awarded at in person appointments, known as INFOPASS, with USCIS at their field offices. The Agency, however, makes obtaining such stamps extremely difficult and often refuses to provide INFOPASS appointments.

*Congress Created Mandatory Adjudication Deadlines for Forms I-829*

56. The text, structure, and history of 8 U.S.C. § 1186b reveal a clear congressional intent to create an enforceable, mandatory adjudication deadline of 180 days.

57. The text of the statute is the best indicia of congress' intent to impose a mandatory deadline.

58. After receiving the Form I-829, the Agency "shall" hold an in-person interview, waive the interview, or waive the deadline for the interview within 90 days. 8 U.S.C. § 1186b(d)(3). If the Agency holds the interview, it "shall" decide the Form I-829 within 90 days of the interview. 8 U.S.C. § 1186b(c)(3)(A).

59. If the Agency waives the interview, it also "shall" decide the Form I-829 within 90 days of filing. 8 U.S.C. §§ 1186b(c)(3)(A), 1186b(d)(3). Adding up these two deadlines, 90 days for an interview decision, and 90 days post-interview decision for a final decision yields a maximum

processing time of 180 days to reach a final decision on a properly filed Form I-829.[4] *Id.*

60. The statute contains no exceptions to these plain, mandatory deadlines. *Id.* Thus, the plain text of the relevant statutory text demonstrates a clear congressional intent to create an enforceable, mandatory adjudication deadline.

61. Second, the structure of § 1186b reinforces this reading in at least two ways. Elsewhere in § 1186b, congress created aspirational deadlines and exceptions to deadlines. *See* 8 U.S.C. § 1186b(a)(2)(B) (stating USCIS "shall attempt to provide notice . . . at or about the beginning of the 90-day period"); § 1186b(d)(2)(A)-(B) (requiring Form I-829 to be filed within 90 days of second anniversary but allowing late applications for "good cause and extenuating circumstances").

62. But there is no aspirational language or exception to the 180-day maximum adjudicatory deadline within § 1186b. *See* 8 U.S.C. §§ 1186b(d)(3), 1186b(c)(3)(A). And "where Congress uses certain language in one part of the statute and different language in another, the variation is presumed intentional[,] and the different words should be given different meanings." *Travieso v. Glock Inc.*, 526 F. Supp. 3d 533, 546 (D. Ariz. 2021), *appeal dismissed*, No. 21-15539, 2021 WL 4295762 (9th Cir. July 6, 2021) (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993); *Russello v. United States*, 464 U.S. 16, 23 (1983)).

63. Simply said, because congress created aspirational deadlines and exceptions to deadlines elsewhere in § 1186b, congress's choice to use mandatory language in its adjudicatory deadlines and choice to create no exception to the adjudicatory deadlines reveals an intent to make those deadlines mandatory and enforceable. It certainly adds no uncertainty to the unambiguous language of the statute.

---

[4] Of course, the agency may waive the interview and reach an interview sooner than the 180-day maximum deadline. 8 U.S.C. §§ 1186b(c)(3)(A), 1186(d)(3)

64. Third, the history of § 1186b further reinforces this intent. Opponents of the investor visa program primarily objected on two grounds: (1) the program was the equivalent of selling citizenship; and (2) applicants may have acquired their investment funds illegally via drug trafficking and fraud, and they would use their illegal gotten gain to get a green card and defraud the United States. 100 Cong. Rec. S2129 (Mar. 14, 1988) (statement of Sen. Bumpers).

65. Supporters of the program rebutted the first charge by citing to the *job creation* aspects of the program; the program created jobs for American workers. *Id.* S2127. And it rebutted the second charge that the program would facilitate money laundering and fraud by highlighting the conditional residence paradigm:

> The aliens who create the new jobs and invest the required money will receive a conditional status. They cannot run in and run out. They cannot just hook on and distort and defraud our systems. Under this, they are going to receive a conditional status for 2 years, so that we are then able to ensure that their investments and their job creating activities were not entered into merely to evade the U.S. immigration laws. It is a very key part to remember here, a conditional status.

*Id.* at S2127 (statement of Sen. Simpson). In fact, the original title of the provision that would later be codified at § 1186b was "Deterring Immigration-Related Entrepreneurship Fraud." Immigration Act of 1990, Pub. Law. No. 101-649, § 121(b), 104 Stat. 4978 (Nov. 29, 1990); *see also* Immigration Act of 1988, S. Rep. 100-290, 12 (Feb. 26, 1988).

66. The Senate Report discussing this provision further emphasized that the 2-year conditional period was meant to ensure the investor was continuing to sustain the business and not defrauding the government. *See generally id.*; *id.* at 18 ("the committee intends that processing of an individual visa will not continue under this section if it becomes known to the government that the money invested was obtained by the alien through other than legal means (such as money received through the sale of illegal drugs)."). The proponents of the investor visa program succeeded, revealing the intent of conditional status afforded within § 1186b sufficed to

prevent fraud and money laundering.

67. Congress reasoned that the anti-fraud purpose of §1186b would remain served by the intended, timely adjudication of the Form I-829 within the 180-day maximum deadline thereby deciding that delays or longer processing times would not ferret out fraud or deter fraud.

68. Indeed, if a fraudulent investor knew it would take the Agency 3 to 5 years to adjudication the Form I-829,[5] the nefarious investor would have more than time to complete the fraud, petition for relatives, and hide the fraud, at least according to the wisdom of congress. Thus, the adjudication timelines were essential to the deliberative process of getting the bill passed because they compromised to best ensure the investor visa program would not allow long windows of time for drug traffickers and money launderers to defraud the public.

69. Finally, congressional actors have recognized the mandatory nature of these deadlines. For example, the Congressional Research Service stated plainly: “USCIS is required by statute to interview immigrant investors within 90 days of submitting Form I-829, but the agency also has the authority to waive that requirement.” CRS, EB-5 Immigrant Investor Visa (Dec. 16, 2021) (available at https://crsreports.congress.gov/product/pdf/R/R44475 (last visited Feb. 27, 2022)). The same report noted that the Agency interviewed only 44 Form I829 applicants in 2018 despite it deciding 2,714 Forms I-829[6] during FY 2018; the Agency interviewed 1.6% of applicants (44/2714).

70. The Agency is aware of this mandatory, enforceable deadline, but it refuses to comply.

*The Agency Promulgated a Mandatory,*
*Enforceable Regulatory Adjudication Deadline*

---

[5] See https://egov.uscis.gov/processing-times/ (choose “Form I-829” from Form dropdown menu; then choose “Immigrant Investor Program Office” from second dropdown menu; then click “Get processing time”).

[6]https://www.uscis.gov/sites/default/files/document/data/I829_performancedata_fy2018_qtr4.pdf (last visited Jun. 29, 2022).

71. The text, structure, and history of 8 C.F.R. § 216.6 also reveal a clear intent to create a mandatory, enforceable statutory decisional deadline of 180 days.

72. The text of the version § 216.6 currently in force[7] is clear: within 90 days of filing, the agency must either (1) have an interview or (2) waive the interview before issuing a final decision within 90 days thereafter: "The director must either waive the requirement for an interview and adjudicate the petition[,] or arrange for an interview within 90 days of the date on which the petition was properly filed." 8 C.F.R. § 216.6(b)(1). And if the Agency has an interview, the Agency must then issue a final decision within 90 days after the interview: "The decision on the petition shall be made within 90 days of the date of filing or within 90 days of the interview, whichever is later." 8 C.F.R. § 216.6(c)(1).

73. The structure of the regulation reinforces this deadline, which accords with the statutory scheme.

74. The regulations provide one exception to its mandatory adjudication timeline: "If the interview is rescheduled at the request of the alien, the Service shall not be required to conduct the interview within the 90–day period following the filing of the petition." *See* 8 C.F.R.

---

[7] The INS initially promulgated § 216.6 on May 23, 1994. 59 FR 26587-01, 26588, 1994 WL 197772 (INS May 23, 1994). This version remained in force until July 2009 when the Agency made technical changes to remove references to legacy INS and removed an irrelevant paragraph from § 216.6. *See* 74 Fed. Reg. 26933-01, 26939, 2009 WL 1560131 (DHS Jun. 5, 2009) ("Section 216.6, is amended by removing and reserving paragraph (a)(2)."). This is the version that remains in effect today. However, since 2019, the Agency has twice attempted to modify § 216.6, but both rulemakings were set aside. DHS's 2019 rulemaking at 84 FR 35750-01 (DHS July 24, 2019) was set aside by *Behring Reg'l Ctr. LLC v. Wolf*, No. 20-CV-09263-JSC, 2021 WL 2554051 (N.D. Cal. June 22, 2021). DHS's 2020 rulemaking at 85 Fed. Reg. 46,788 (Aug. 3, 2020) was set aside by *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021). Thus, the regulation in place after the 2009 amendments remains the operative regulation today and remains located at 74 Fed. Reg. 26939 (DHS June 5, 2009).

§ 216.6(b)(3). If the regulatory deadline were not mandatory, this exception would not be necessary.

75. Further, like the statute, Agency also promulgated aspirational deadlines and exceptions to other deadlines in the same rulemaking, despite using mandatory language for the adjudication deadlines and refusing to promulgate exceptions to these deadlines due *Agency's* delay, excuse, or inconvenience. *See* 8 C.F.R. §§ 216.2(c) (setting aspirational deadline for the Agency's notice), 216.6(b)(3) (creating good cause exception for failing to appear at mandatory interview), 216.6(a)(5) (creating exception to mandatory filing time period).

76. Finally, the regulatory history reveals the Agency's belief that these regulatory deadlines are mandatory and enforceable.

77. The legacy INS issued the original notice of proposed rulemaking for § 216.6 in early 1994. 59 Fed. Reg. 1317-01, 1994 WL 4322 (INS Mar. 28, 1994). INS stated the obvious at the outset of the rulemaking: "The statute also calls for a personal interview of the alien within 90 days after the date the alien files the petition for removal of conditions." *Id.* at 1317.

78. The INS also noted that it could "waive the requirement of an interview in the appropriate cases[.]" *Id.*

79. Based on these two interpretations of the statute, INS proposed the following two key regulatory provisions: "The director must either waive the requirement for an interview and adjudicate the petition or arrange for an interview within 90 days of the date on which the petition was properly filed." *Id.* at 1321. And the "decision on the petition shall be made within 90 days of the date of filing or within 90 days of the date of interview, whichever is later." *Id.* at 1322.

80. The INS interpreted the statute to require either (1) a decision to waive the interview and a final decision within 90 days of filing or (2) an interview within 90 days of filing and a final

decision within 90 days of that interview.

81. Finally, the regulatory history reinforces this intent.

82. The INS's response to the relevant comments reveals that it believed its regulation would create an enforceable adjudicatory deadline. 59 FR 26587-01, 26588, 1994 WL 197772 (INS May 23, 1994). "Two commenters criticized the proposed regulation for lacking any time limits for the Service to adjudicate a petition for removal of conditions." *Id.* The INS disabused the commenters of the notion that the regulation did not include an adjudicatory deadline:

> Section [1186b(c)(3)] provides that the Attorney General make a determination on a petition to remove conditions within 90 days of the date the petition is filed or within 90 days of the interview, whichever is later. Accordingly, 8 CFR 216.6(b)(1) of the proposed regulation states that the Service Center director must either waive the interview requirement and adjudicate the petition or arrange for an interview within 90 days of the date the alien entrepreneur filed the petition. This regulation is, of course, subject to the provisions of 8 CFR 103.2(b)(10)(i). 8 CFR 216.6(c)(1) provides that a decision on a petition shall be made within 90 days of the date of filing or within 90 days of the date of interview, whichever is later. The above provisions in the proposed regulation adequately address the commenters' concerns as well as meet the adjudication timeline set forth in section 216A(c)(3) of the Act.

*Id.* at 26588. The final rule implemented the language of the proposed rule unchanged. *Id.* at 26592.

83. The Agency updated the regulation in 2009 and it did not change this language; in other words, the Agency had the opportunity to change the regulatory deadlines, but it did not. 74 FR 26933-01, 26939, 2009 WL 1560131 (DHS Jun. 5, 2009).[8] The original adjudicatory deadlines remain in place today (likely because the plain language of the statute leaves no gaps for interpretation). The Agency's regulatory history reveals it considers its regulatory deadlines

---

[8] In this rulemaking, the Agency did remove paragraph (a)(2) of the original regulation, which is irrelevant to the adjudicatory deadline. 74 FR 26933-01, 26939, 2009 WL 1560131 (DHS Jun. 5, 2009).

mandatory and enforceable to comport with the plain text of the governing statute.

84. In addition, the Agency has recognized these deadlines are mandatory in other rulemakings: “DHS acknowledges that processing times for many forms, including Form I-829, have exceeded the goals established by USCIS. Furthermore, *DHS acknowledges its obligation* to adjudicate Form I–829 filings within 90 days of the filing date or interview, whichever is later.” 85 Fed. Reg. 46,788, 46,854 (Aug. 3, 2020) (emphasis added). This is further indication that the Agency recognizes its regulatory deadlines as mandatory and enforceable. *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31 (D.D.C. 2020).

85. The Agency is aware of this regulatory deadline, and it knowingly violates it with impunity.

**FACTS**

86. Plaintiff Yun Gu (A066021956) invested in the NCE administered by NYC Metro Regional Center, LLC.

87. USCIS approved Ms. Gu’s initial Form I-526, and Ms. Gu and Mr. Yang, her son, became CLPRs. On 2019-11-07, Plaintiffs filed their Form I-829 with the Agency.

88. USCIS assigned Ms. Gu’s petition receipt number WAC2090005007 and Mr. Yang’s receipt number WAC2000850102.

89. Plaintiffs have now been waiting at least 43 months for USCIS to schedule an interview, waive an interview, waive an interview deadline, or render a final decision.

90. But the Agency has taken no significant adjudicative action.

91. This continued delay is harming Plaintiffs.

92. First, Mr. Yang has now attended his naturalization interview and USCIS indicated that it cannot naturalize him until USCIS makes a decision on his Form I-829. This is actively

preventing Mr. Yang from becoming a United States citizen because the USCIS adjudicator indicated he was eligible for naturalization, but for the pending decision on his Form I-829.

93. Second, Ms. Gu is now 65 years old.

94. Ms. Gu's mother is 85 years old, and her father is 90 years old and they are suffering from a set of health conditions. Ms. Gu's father was diagnosed with Alzheimer's disease and diabetes. And they require Ms. Gu's accompany.

95. The unreasonable delay in the approval of the I-829 forces Ms. Gu to apply for the I-551 ADIT stamp via info pass appointment every time she needs to travel internationally, and the process was not trivial and has caused unreasonable delays in the past.

96. Ms. Gu and Mr. Yang have reached out to senator Ed Markey, and his office agreed to check with USCIS on their behalf regarding the latest status of the I-829 case.

97. But the USCIS provided no explanation or prediction of when the condition will be removed.

98. These delays are violative of congressional intent.

**FIRST CAUSE OF ACTION**
**(APA – ARBITRARY AND CAPRICIOUS VIOLATION OF STATUTORY OR REGULATORY DEADLINE)**

99. Plaintiffs incorporate the prior allegations as though restated here.

100. The APA defines agency action to include a "failure to act." 5 U.S.C. § 551(13).

101. Thus, when an agency knowingly violates a statutory or regulatory deadline by failing to act, it is considered arbitrary and capricious agency action. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002) (enforcing statutory deadline)*; Gonzalez Rosario v. United States Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1160 (W.D. Wash. 2018) (enforcing regulatory deadline).

102. Here, congress enacted a statutory deadline for adjudication of a Form I-829, requiring a final decision within 180 days, and the Agency promulgated a 180-day regulatory deadline for adjudication of a Form I-829.

103. The Agency did not interview, waive an interview, waive an interview deadline, or render a final decision for Plaintiffs within 90 or 180 days.

104. The Agency's violation of this congressional and regulatory deadlines is arbitrary and capricious under 5 U.S.C. § 706(2).

105. The Agency's arbitrary and capricious agency action is not justified.

**SECOND CAUSE OF ACTION**
**(APA –UNLAWFUL WITHOLDING OF AGENCY ACTION)**

106. Plaintiffs incorporate the prior allegations as though restated here.

107. The APA prohibits USCIS from unlawfully withholding agency action in violation of statutory or regulatory deadlines. 5 U.S.C. § 706(1); *Oxfam Am., Inc. v. United States Sec. & Exch. Comm'n*, 126 F. Supp. 3d 168, 172 (D. Mass. 2015) (compelling agency to promulgate rule where it violated congressional deadline) (citing *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002)); *Tang v. Chertoff*, 493 F.Supp.2d 148, 155 (D.Mass.2007); *see also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir.1999) (noting that "when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action . . . ").

108. Where "Congress has specifically provided a deadline for performance," courts in the Ninth Circuit enforce it. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002); *see also Gonzalez Rosario v. United States Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1161 (W.D. Wash. 2018) (holding *Badgley* also applies to regulatory deadlines).

109. Here, congress enacted a statutory deadline for adjudication of a Form I-829, requiring a final decision within 180 days, and the Agency promulgated a 180-day regulatory deadline for adjudication of a Form I-829.

110. The Agency did not interview, waive an interview, waive an interview deadline, or render a final decision for Plaintiffs within 90 or 180 days.

111. Plaintiffs have waited well beyond 6 months.

112. The Agency's violation of this congressional deadline is arbitrary and capricious constitutes unlawful withholding of Agency action under 5 U.S.C. § 706(1)

113. The Agency's violation of its own regulatory deadline is arbitrary and capricious constitutes unlawful withholding of Agency action under 5 U.S.C. § 706(1)

114. USCIS has unlawfully withheld action in violation of mandatory adjudication timelines.

115. This Court should compel USCIS to issue final agency action on Plaintiff's petition immediately.

116. This breach of a mandatory deadline is unjustified.

**THIRD CAUSE OF ACTION**
**(APA – UNREASONABLE DELAY)**

117. Plaintiffs incorporate the prior allegations as though restated here.

118. To the extent neither the statute nor the regulation contains an enforceable adjudicatory deadline, the APA requires USCIS to decide Plaintiffs' I-829 petitions "within a reasonable amount of time." 5 U.S.C. § 555(b).

119. USCIS has unreasonably delayed action on Plaintiffs' pending I-829 Petitions for more than 33 months.

120. The Agency delay is unreasonable.

121. These delays constitute an unreasonable delay under the five factors laid out in *Telecommunications Research & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70 (D.C. Cir. 1984). Those factors comprise:

> (1) "the time an agency takes to make a decision should be governed by a 'rule of reason' "; (2) "[t]he content of a rule of reason can sometimes be supplied by a congressional indication of the speed at which the agency should act"; (3) "the reasonableness of a delay will differ based on the nature of the regulation; that is, an unreasonable delay on a matter affecting human health and welfare might be reasonable in the sphere of economic regulation"; (4) "the effect of expediting delayed actions on agency activity of a higher or competing priority . . . [and] the extent of the interests prejudiced by the delay"; and (5) "a finding of unreasonableness does not require a finding of impropriety by the agency."

*Id.*

122. The *TRAC* factors favor Plaintiffs.

123. First, USCIS has no "rule of reason" for adjudicating Forms I-829.

124. USCIS does not decide them on a first in, first out basis because later-filed Forms I-829 have been approved.

125. USCIS has granted certain NCEs project-wide expedites, rushing adjudications of 350-plus EB5 petitions at the expense of all other pending petitions, because the owner of the NCE was a political supporter of former President Trump.

126. In fact, USCIS has changed its processing for Forms I-829 various times over the past couple of years.

127. Further, USCIS indicates that it takes only 8.15 hours to decide Forms I-829. Based on publicly available information, if USCIS adjudicated Forms I-829 on a first in first out basis, upon information and belief, it would have already decided Plaintiffs' petitions given its current backlog. However, USCIS does not record or report sufficient *actual* staffing and staff hours to

get to an *actual* adjudication time. This is an *assumed* adjudication time per petition. And therefore, USCIS cannot rely on it to defend this case.

128. Thus, to the extent USCIS has a rule of reason for Forms I-829, it is not following it here.

129. Finally, USCIS does not decide Form I-829 petitions on a "first in, first out" basis because it adjudicates direct investment projects and exemplar regional center projects through different processes, and it does not decide petitions in a chronological filing order.

130. This is evident as their recent stated processing times previously encompassed an expected *range of adjudication stretching across approximately 18 years.*

131. Second, Congress has provided context to this rule of reason by announcing a timeline for adjudication of Form I-829 petitions within 90 days. 8 U.S.C. § 1186b(d)(1).

132. This is further reinforced by Congress's sense that it should take no more than 180 days to decide any immigration petition. *See* 8 U.S.C. § 1571(b).

133. Third, the Agency's delay impacts human health and welfare, not merely economic interests. Plaintiffs' lives are on hold. USCIS's delay is depriving them of, *inter alia*, the ability to remove the conditions on their status, obtain ongoing proof of lawful immigration status (*i.e.* valid, unexpired Green Cards), and apply for naturalization as United States Citizens.

134. Moreover, by unlawfully delaying Form I-829 adjudications and not providing Plaintiffs with ongoing evidence of their status given that Plaintiff's conditional status has expired, Defendant has violated 8 C.F.R. § 216.1, which entitles them to "the rights, privileges, responsibilities and duties which apply to all other lawful permanent residents." *Id.*

135. It also puts Plaintiffs at risk of violating the law by lacking proof of their current immigration status under 8 U.S.C. § 1304(e).

136. Fourth, compelling agency action here would have no effect on a USCIS activity of a higher or competing priority.

137. USCIS takes fees from petitioners when filing Forms I-829 in exchange for processing the petitions. USCIS sets the fee rate based upon the cost it incurs to process visa and benefit applications in a timely fashion. USCIS cannot defend its actions by alleging a lack of resources when it charges fees to pay for resources needed to fulfil its statutory duty. This is especially true when considering the agency raised its fees to increase capacity and is seeking to do so presently. This is even more true in a case like this where USCIS has taken double its "normal" fees for a family seeking I-829 adjudication.

138. Moreover, the historic delays accelerated after additional employees were hired and fees were increased.

139. It strains credulity to say compelling government action to decide would only put Plaintiffs' petition to the front of the line. *See TRAC*, 750 F.2d at 80 (noting courts should consider the prejudice to the agency's claimed interest).

140. By every metric, the "line" for Form I-829s processing should not exist beyond 90 days after each filing. But there is no "line" for Form I-829 adjudication anyway as the Agency's adjudicative procedures are in disarray.

141. Finally, there is no rational explanation for the explosion in processing times. As mentioned above, Defendant is informing the public that it is within normal processing for Forms I-829 to take *nearly 21 years* to adjudicate. When seen in context of the agency's overall approach to its statutory requirements, the circumstantial evidence of impropriety is palpable. However, this Court need not find such evidence under *TRAC* to find the instant delay is unreasonable.

142. Upon information and belief, Defendant has taken affirmative actions, unknown to the

public, to inflate USCIS' published processing times and purposefully delay adjudications of Form I-829 petitions.

143. Defendant knowingly and in bad faith violates the congressional and regulatory deadlines.

144. Each TRAC factor weighs in favor of ordering USCIS to issue a decision on Plaintiff's I-829 Petition; thus, USCIS's delay is arbitrary and capricious under 5 U.S.C. § 706.

145. Plaintiffs demand discovery from Defendant to develop the administrative record, and establish his delay is unlawful, intentional, and targeted at a specific and identifiable group. This includes discovery, requests for production, interrogatories, and depositions of the IPO director, his/her senior IPO staff, as well as supervisors and adjudicators who have been assigned to process these petitions.

146. The delays described *supra* are not substantially justified.

**CLAIM FOR EQUAL ACCESS TO JUSTICE ACT FEES**

147. Plaintiffs incorporate the prior allegations as though restated here.

148. USCIS's current delay is substantially unjustified under the APA.

149. Plaintiffs are otherwise qualified for fees under the *Equal Access to Justice Act*.

150. Plaintiffs are entitled to reasonable attorney's fees under the *Equal Access to Justice Act*.

**PRAYER FOR RELIEF**

Plaintiffs pray this Court will:

151. Declare the Agency's decision to violate the statutory and regulatory adjudication deadlines that control adjudication of Form I-829 petitions is arbitrary and capricious;

152. Declare the Agency has unlawfully withheld agency action by violating the statutory and regulatory adjudicatory deadlines that control adjudications of Form I-829 petitions;

153. Declare the delays associated with Plaintiffs' Form I-829 petitions unreasonable;

154. Enter an order compelling the Agency to adjudicate Plaintiff's pending petitions within 30 days;

155. If approved, order the Defendant to print and duly deliver the associated Forms I-551 evidencing unconditional permanent residency for each Plaintiffs within 15 days;

156. Order USCIS to pay reasonable attorneys' fees; and

157. Enter and issue other relief that this Court deems just and proper.

June 16, 2023

Respectfully submitted,

*s/Bernard P. Wolfsdorf*
Bernard P. Wolfsdorf
CA Bar No. 107657
Wolfsdorf Rosenthal, LLP
1416 2ND Street
Santa Monica, CA 90401
Tel: (310) 570-4088
bernard@wolfsdorf.com

Attorney for the Plaintiffs